Filed 12/10/15 (unmodified opn. attached)

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C070296 |
| Plaintiff and Respondent, | (Super. Ct. No. 08F02622) |
| v. | |
| DENNIS NILSSON, | |
| Defendant and Appellant. | |
| THE PEOPLE, | C070298 |
| Plaintiff and Respondent, | (Super. Ct. No. 08F02622) |
| v. | ORDER MODIFYING OPINION AND DENYING REHEARING [NO CHANGE IN JUDGMENT] |
| JAMES EARLE MAYLE, SR., et al., | |
| Defendants and Appellants. | |

1

THE COURT:

It is ordered that the opinion filed herein on November 12, 2015, be modified as follows:

Delete the second full paragraph on page 20 that begins, "The Attorney General tries to distinguish . . . ," and replace the paragraph with the following text:

The Attorney General tries to distinguish *Packard* by asserting that "there were two distinctive plans, not one ongoing scheme." She claims that, when defendants changed their strategy for overbilling in response to the Library's decision in 2006 to solicit bids for maintenance services, the change in the defendants' approach constituted a new scheme under *Bailey*. To the contrary, the "overarching scheme" (*Whitmer, supra,* 59 Cal.4th at p. 741) was to take money from the Library by overbilling for services. A change in some of the details in effectuating that overarching scheme did not constitute a new or different overarching scheme.

The facts of *Bailey* are analogous. In that case, the defendant was convicted of grand theft for taking welfare money while misrepresenting her circumstances. She claimed to be a single person when she was living with a man as husband and wife. At first, she claimed that the man was a renter in her home. But when a social worker told her that the man's income would be considered in determining her eligibility for assistance, she told the welfare department that the man had left the home, even though he had not. (*Bailey, supra,* 55 Cal.2d at pp. 515-516.) The Supreme Court held that these facts supported one conviction for grand theft, rather than a petty theft conviction for each welfare payment, because the ongoing welfare payments were "motivated by one intention, one general impulse, and one plan . . . ." (*Id*. at p. 519.)

2

As in *Bailey*, the details of defendants' scheme in this case changed when necessary to continue the taking. That change in details did not constitute a different grand theft under the *Bailey* doctrine.

This modification does not change the judgment.

The petition for rehearing is denied.

THE COURT:


_____NICHOLSON_____, Acting P. J.


_____MAURO_____, J.


_____HOCH_____, J.

Filed 11/12/15 (unmodified version)

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C070296 |
| Plaintiff and Respondent, | (Super. Ct. No. 08F02622) |
| v. | |
| DENNIS NILSSON, | |
| Defendant and Appellant. | |
| THE PEOPLE, | C070298 |
| Plaintiff and Respondent, | (Super. Ct. No. 08F02622) |
| v. | |
| JAMES EARLE MAYLE, SR., et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of Sacramento County, Allen Sumner, Judge.  Affirmed in part and reversed in part.

Matthew H. Wilson, under appointment by the Court of Appeal, for Defendant and Appellant Dennis Nilsson.

Stephen M. Lathrop, under appointment by the Court of Appeal, for Defendant and Appellant James Earle Mayle, Sr.

Valerie G. Wass, under appointment by the Court of Appeal, for Defendant and Appellant Janie Mae Rankin-Mayle.

Kamala D. Harris, Attorney General, Michael P. Farrell, Senior Assistant Attorney General, and Ward A. Campbell, Deputy Attorney General, for Plaintiff and Respondent.

Defendant Dennis Nilsson, the facilities superintendent for the Sacramento Public Library Authority (Library), was involved in several schemes to receive kickbacks for Library maintenance work provided by outside contractors.  One of these schemes included defendant James Earle Mayle, Sr., who was also a Library employee, and defendant Mayle's wife, defendant Janie Mae Rankins-Mayle, who was not a Library employee.  The scheme involving all three defendants resulted in a loss of more than $780,000 to the Library.

Convicted variously of grand theft, embezzlement, offering or receiving a bribe, and conflict of interest, defendants appeal.  We conclude that (1) as to defendants Mayle and Rankins-Mayle, we must strike an enhancement imposed under Penal Code section 186.11[1] because the prosecution did not meet the pleading and proof requirement, (2) as to defendant Nilsson, we must strike one count of grand theft because the law applicable at the time he committed his crimes permitted only one grand theft conviction for multiple takings done pursuant to a single overarching scheme, and (3) as to defendant

---

[1]    Hereafter, unspecified code citations are to the Penal Code.

Nilsson, the trial court must properly indicate in the abstract of judgment what restitution is subject to joint and several liability. Finding no other prejudicial error, we make the noted modifications to the convictions, affirm the convictions as modified, reverse the sentence, and remand for resentencing and preparation of amended abstracts of judgment.

PROCEDURE

The district attorney filed an amended information charging defendants as follows:

- Count one (all defendants) – grand theft (§ 487, subd. (a)) from November 1, 2006, to June 30, 2007.
- Count two (all defendants) – grand theft (§ 487, subd. (a)) from April 1, 2004, to October 31, 2006.
- Count three (defendant Nilsson only) – receiving a bribe as a public employee (§ 68).
- Count four (defendants Mayle and Rankins-Mayle only) – offering a bribe to a public employee (§ 67.5, subd. (b)).
- Count five (defendant Nilsson only) – conflict of interest (Gov. Code, § 1090).
- Count six (defendant Mayle only) – conflict of interest (Gov. Code, § 1090).
- Count seven (defendant Nilsson only) – embezzlement (§ 514).
- Count eight (defendant Nilsson only) – receiving a bribe (§ 68).
- Count nine (defendant Nilsson only) – conflict of interest (Gov. Code, § 1090).
- Count ten (defendant Nilsson only) – grand theft (§ 487, subd. (a)).
- Count eleven (defendant Nilsson only) – receiving a bribe (§ 68).
- Count twelve (defendant Nilsson only) – conflict of interest (Gov. Code, § 1090).
- Count thirteen (defendant Nilsson only) – grand theft (§ 487, subd. (a)).
- Count fourteen (defendant Nilsson only) – receiving a bribe (§ 68).
- Count fifteen (defendant Nilsson only) – conflict of interest (Gov. Code, § 1090).
- Count sixteen (defendant Nilsson only) – grand theft (§ 487, subd. (a)).
- Count seventeen (defendant Nilsson only) – receiving a bribe (§ 68).

3

- Count eighteen (defendant Nilsson only) – conflict of interest (Gov. Code, § 1090).

The amended information also alleged:

- As to counts one, two, seven, ten, thirteen, and sixteen, the loss exceeded $150,000 (former §§ 1203.045, 12022.6, subd. (a)(2)).

- As to counts one, two, seven, ten, thirteen, and sixteen, the loss exceeded $50,000 (former § 12022.6, subd. (a)(1)).

- As to counts one, two, seven, ten, thirteen, and sixteen, those offenses were related felonies, a material element of which is fraud and embezzlement, involving a pattern of related felony conduct resulting in a loss of greater than $500,000 (§ 186.11, subd. (a)(2)).

- As to counts one, two, seven, ten, thirteen, and sixteen, those offenses were related felonies, a material element of which is fraud and embezzlement, involving a pattern of related felony conduct resulting in a loss of greater than $100,000 but less than $500,000 (§ 186.11, subd. (a)(3)).

The three defendants were tried together; however, there were two juries. One jury tried defendant Nilsson, and the other tried defendants Mayle and Rankins-Mayle.

Defendant Nilsson's jury found him guilty on all counts and found true all enhancement allegations applicable to him.

The jury trying defendants Mayle and Rankins-Mayle also found them guilty on all counts and found true all enhancement allegations. In response to a request from counsel for defendants Mayle and Rankins-Mayle, the trial court asked the jury to make a special finding concerning whether the grand thefts charged in counts one and two were separate and distinct offenses. The jury found that those two counts were not separate and distinct offenses. The trial court did not request a finding on this issue from defendant Nilsson's jury.

4

Because the jury trying defendants Mayle and Rankins-Mayle found that the grand thefts charged in counts one and two were not separate and distinct, the trial court dismissed count one, as to defendants Mayle and Rankins-Mayle only, and amended count two to cover the time period previously covered by counts one and two together.

The trial court sentenced defendant Nilsson as follows:

- Base term:  three-year upper term on count two (grand theft).
- Consecutive eight-month term on count one (grand theft).
- Consecutive one-year term on count eight (receiving a bribe).
- Consecutive one-year term on count eleven (receiving a bribe).
- Consecutive one-year term on count fourteen (receiving a bribe).
- Consecutive one-year term on count seventeen (receiving a bribe).
- Consecutive five-year upper term for the section 186.11, subdivision (a)(2) enhancement.  (The lesser included enhancement term was stayed.)
- Consecutive two-year term for the former section 12022.6, subdivision (a)(2) enhancement.  (The lesser included enhancement term was stayed.)
- Terms were imposed but stayed on the remaining counts.

The total unstayed sentence for defendant Nilsson was fourteen years eight months.

The trial court sentenced defendant Mayle as follows:

- Base term:  sixteen-month lower term on count two (grand theft).
- Consecutive two-year lower term for the section 186.11, subdivision (a)(2) enhancement.  (The lesser included enhancement term was stayed.)
- Consecutive two-year term for the former section 12022.6, subdivision (a)(2) enhancement.  (The lesser included enhancement term was stayed.)
- Terms were imposed but stayed on the remaining counts.

The total unstayed sentence for defendant Mayle was five years four months.

The trial court sentenced defendant Rankins-Mayle as follows:

5

- Base term: two-year middle term on count two (grand theft).
- Consecutive two-year lower term for the section 186.11, subdivision (a)(2) enhancement. (The lesser included enhancement term was stayed.)
- Consecutive two-year term for the former section 12022.6, subdivision (a)(2) enhancement. (The lesser included enhancement term was stayed.)
- A term was imposed but stayed for count four.

The total unstayed sentence for defendant Rankins-Mayle was six years.

The court also imposed restitution, fines, and fees as to all defendants.

FACTUAL BACKGROUND

A.  *Defendant Nilsson's Conduct with Various Contractors (Counts Seven through Eighteen)*

Defendant Nilsson was the facilities superintendent for the Library, which meant that he oversaw all Library maintenance for the various facilities, starting in 1999. In this role, he assigned maintenance work to outside contractors and approved invoices for payment, which were paid from the Library's budget. Before 2006, the Library did not have a policy requiring bids from contractors wishing to provide maintenance services.

During his tenure at the Library, defendant Nilsson entered into separate arrangements with three different maintenance contractors – Reinhold Thomas Mueller, Roger Spencer, and Michael McGrath. Under these arrangements, defendant Nilsson had the contractors overbill the Library for their services and kickback to defendant Nilsson the amount of the overpayment.

B.  *Scheme of Defendant Nilsson with Defendants Mayle and Rankins-Mayle (Counts One through Six)*

Defendant Mayle was the supervisor of Library security and a friend to defendant Nilsson. Defendant Rankins-Mayle, who was not a Library employee, was married to defendant Mayle and owned apartments for which she regularly hired contractors to do

6

work.  Defendant Mayle and defendant Rankins-Mayle owned a company called All City Maintenance.  The company had a business license, but not a contractor's license.

In 2004, defendant Nilsson entered into an agreement with All City Maintenance, which was the subject of a memo from defendant Nilsson to Mark Parker, who was deputy director of library services for the Library.  Defendant Nilsson wrote:

"On February 18, 2004 I met with representatives from All City Maintenance regarding their ability of have [*sic*] a pool of contractors available to respond to our maintenance and work order service requests.

"This company will respond to our maintenance and repair service requests with licensed and insured contractors, provide billing and record keeping at no additional cost to [the Library].

"This arrangement will free General Services staff from the time consuming task of soliciting quality contractors for our maintenance and/or repair requests and reduce and prevent delays in the timely completion of our work orders that may be caused by vacation, illness, prior commitments and other unforeseen events.

"It is anticipated that All City Maintenance will begin providing their service on May 1, 2004."

The memo noted that a courtesy copy was being sent to All City Maintenance, "Attn: J.M. Rankins," which did not include defendant Rankins-Mayles's married name of "Mayle."  Neither did the memo identify defendant Mayle as being associated with the business.  Parker did not know that defendant Rankins-Mayle was married to defendant Mayle.

After defendant Nilsson sent the memo to Parker, contractors who did work for the Library were instructed to send their invoices to All City Maintenance to be submitted to the Library.  However, All City Maintenance neither arranged with the contractors to do the work nor did it supervise the contractors.

7

All City Maintenance began to inflate the invoices submitted by contractors before billing the Library. The amount of bill inflation varied, but commonly was 100 percent or more, so that, for example, a contractor's invoice for $55 was billed to the Library as $110.

In 2005, All City Maintenance became Hagginwood Business Services, Inc. (Hagginwood), with defendants Mayle and Rankins-Mayle as officers.

In 2006, the Library decided to solicit bids for maintenance services based more strictly on hours worked and hourly rates. Hagginwood submitted a bid. In the bid, Hagginwood stated that expenses would be limited to "actual expenditures of CONTRACTOR for expenses that are necessary for the proper completion of the Services . . . ." The Library accepted Hagginwood's bid, which provided that Hagginwood, as a contractor, would charge the Library an hourly rate and pay the subcontractors and all expenses out of that amount.

Under the new contract, Hagginwood continued to bill the Library for the maintenance services provided by outside contractors. Without informing the Library, however, Hagginwood inflated the number of hours reported by the outside contractors when it billed the Library.

A forensic accounting investigation revealed that the Library paid a total of $1,343,891.68 to All City Maintenance and Hagginwood from 2004 to 2007. In turn, those companies paid $562,500.89 to the outside contractors for the services that were performed. In other words, defendants marked up the invoices received from the outside contractors by approximately 138.9 percent and kept $781,390.79. Most businesses have a profit of seven to 10 percent.

The investigator also discovered that, frequently when the Library paid All City Maintenance or Hagginwood, checks would then be issued from one of those entities to all three defendants. Checks from those entities were signed by defendant Rankins-

Mayle, including checks to defendant Nilsson.  Sometimes checks were made to "cash" with a notation that cash was meant for defendant Nilsson.

I

*Aggravated White Collar Crime Enhancement*

*(Mayle and Rankins-Mayle)*

Defendants Mayle and Rankins-Mayle contend that the jury's true findings on the aggravated white collar crime enhancement (§ 186.11) must be struck because the pleading and proof requirement of that enhancement was not met.  We conclude that the contention has merit because the trial court properly dismissed one of the grand theft counts on which the enhancement was based.

A.    *Legal Background*

The aggravated white collar crime enhancement is found in section 186.11.  It provides for an additional term of punishment for "[a]ny person who commits two or more related felonies, a material element of which is fraud or embezzlement, which involve a pattern of related felony conduct, and the pattern of related felony conduct involves the taking of, or results in the loss by another person or entity of, more than one hundred thousand dollars ($100,000) . . . ."  (§ 186.11, subd. (a)(1).)  " '[P]attern of related felony conduct' means engaging in at least two felonies that have the same or

---

[2]    Defendants each join in the arguments of the other defendants.  While we note these joinders, they are not well-taken to the extent defendants have failed to argue a miscarriage of justice in each individual circumstance.  "Joinder may be broadly permitted (Cal. Rules of Court, rule 8.200(a)(5)), but each appellant has the burden of demonstrating error and prejudice (*People v. Coley* (1997) 52 Cal.App.4th 964, 972; *Paterno v. State of California* (1999) 74 Cal.App.4th 68, 106 ['Because of the need to consider the particulars of the given case, rather than the type of error, the appellant bears the duty of spelling out in his brief exactly how the error caused a miscarriage of justice.'])."  (*People v. Nero* (2010) 181 Cal.App.4th 504, 510, fn. 11.)

similar purpose, result, principals, victims, or methods of commission, or are otherwise interrelated by distinguishing characteristics, and that are not isolated events." (§ 186.11, subd. (a)(1).) Also, " 'two or more related felonies' means felonies committed against two or more separate victims, or against the same victim on two or more separate occasions." (§ 186.11, subd. (a)(1).)

"If the pattern of related felony conduct involves the taking of, or results in the loss by another person or entity of, more than five hundred thousand dollars ($500,000), the additional term of punishment shall be two, three, or five years in the state prison." (§ 186.11, subd. (a)(2).) And "[i]f the pattern of related felony conduct involves the taking of, or results in the loss by another person or entity of, more than one hundred thousand dollars ($100,000), but not more than five hundred thousand dollars ($500,000), the additional term of punishment shall be the term specified in paragraph (1) or (2) of subdivision (a) of [former] Section 12022.6." (§ 186.11, subd. (a)(3).)

In addition to the law concerning the aggravated white collar crime enhancement, the trial court was required to apply a California Supreme Court decision concerning whether a continuing scheme of theft is to be treated as one grand theft or constitutes multiple thefts. As we explain, the trial court concluded, based on a finding by the jury, that under *People v. Bailey* (1961) 55 Cal.2d 514 (*Bailey*), the facts supporting the grand theft counts (counts one and two) actually constituted only one grand theft. We also explain that, although the law has changed, the trial court's application of the *Bailey* doctrine was correct based on when the crime was committed.

The full history of the *Bailey* doctrine is recounted in the Supreme Court's recent decision in *People v. Whitmer* (2014) 59 Cal.4th 733 (*Whitmer*), so we provide only a brief summary.

In 1961, the Supreme Court decided *Bailey,* which held: "Whether a series of wrongful acts constitutes a single offense or multiple offenses depends upon the facts of each case, and a defendant may be properly convicted upon separate counts charging

10

grand theft from the same person if the evidence shows that the offenses are separate and distinct and were not committed pursuant to one intention, one general impulse, and one plan. [Citation.]" (*Bailey, supra,* 55 Cal.2d at p. 519.) The question of whether multiple takings are committed pursuant to one intention, general impulse, and plan is a question of fact for the trier of fact based on the particular circumstances of each case. (*People v. Tabb* (2009) 170 Cal.App.4th 1142, 1149-1150.)

After *Bailey* was decided, various Court of Appeal decisions expanded *Bailey* beyond its facts. The decisions "consistently held that multiple acts of grand theft pursuant to a single scheme cannot support more than one count of grand theft." (*Whitmer, supra,* 59 Cal.4th at p. 742.) That holding was applied in this case to strike one of the two grand theft counts, as we recount in more detail later.

In *Whitmer*, decided in 2014, long after defendants' crimes were committed, the California Supreme Court held that those Court of Appeal decisions had misinterpreted and unjustifiably expanded *Bailey*. Those decisions had given serial thieves a " ' "felony discount," ' " meaning that they could be convicted of only one count of grand theft in circumstances in which it should have been possible to convict them of multiple counts of grand theft. Reexamining *Bailey*, the court held that "a defendant may be convicted of multiple counts of grand theft based on separate and distinct acts of theft, even if committed pursuant to a single overarching scheme." (*Whitmer, supra,* 59 Cal.4th at pp. 740, 741.)

Having refocused the *Bailey* doctrine, however, the *Whitmer* court held that abolition of the " ' "felony discount" ' " could not be applied to crimes committed during the time it was in effect – that is, during the time the series of Court of Appeal decisions expanding the *Bailey* doctrine remained valid precedents – because the later *Whitmer* holding was "an unforeseeable judicial enlargement of criminal liability for multiple grand thefts." (*Whitmer, supra,* 59 Cal.4th at p. 742.)

11

The result of *Bailey*, the intervening Court of Appeal decisions, and *Whitmer*, is that defendants in this case committed their grand thefts at a time when the felony discount was in effect. Even though they could have been convicted of multiple grand theft counts under a proper reading of *Bailey*, they could not be so convicted under the authority of the intervening Court of Appeal decisions.

B.  *Procedural Background Relating to Defendants Mayle and Rankins-Mayle*

In an amended information, the district attorney charged defendants Mayle and Rankins-Mayle with two counts of grand theft (counts one and two) and one count of bribery (count four). Concerning the aggravated white collar crime enhancement, the district attorney included the following enhancement allegation as to defendants Mayle and Rankins-Mayle: "It is further alleged, pursuant to Penal Code [section] 186.11(a), that the offenses set forth in Counts One and Two . . . are related felonies, a material element of which is fraud and embezzlement, which involve a pattern of related felony conduct, and the pattern of related felony conduct involves the taking of more than five hundred thousand dollars ($500,000) pursuant to Penal Code section 186.11(a)(2) and more than one hundred thousand dollars ($100,000) pursuant to Penal Code section 186.11(a)(3)."

Based on the *Bailey* doctrine, the trial court instructed the jury to make a true or not true finding concerning whether counts one and two were separate and distinct offenses. The jury found defendants Mayle and Rankins-Mayle guilty on counts one, two, and four, but it also found that the grand thefts charged in counts one and two were not separate and distinct.

Because of the jury's finding that the grand thefts charged in counts one and two were not separate and distinct, the trial court, applying the *Bailey* doctrine, struck count one and amended count two to cover the entire period of time previously covered by the two counts combined. However, the court did not strike the finding that counts one and two were related felonies under the aggravated white collar crime enhancement. Instead,

12

the trial court found that counts two (grand theft) and four (bribery) were the related felonies, even though it acknowledged that the jury had not been asked to determine whether counts two and four were related felonies for the purpose of imposing the aggravated white collar crime enhancement.

The trial court also recognized that, for the aggravated white collar crime enhancement to apply, the person must commit "two or more related felonies, a material element of which is fraud or embezzlement . . . ." (§ 186.11, subd. (a)(1).) However, it reasoned that the term " 'element' " in the statute simply means that the crime, in the court's words, "involved a factor, a circumstance of fraud or embezzlement."

Based on that reasoning, the trial court added the lower term of two years to the sentences of defendants Mayle and Rankins-Mayle for the aggravated white collar crime enhancement under section 186.11, subdivision (a)(2).

C.    *Analysis*

1.    Pleading and Proof Problem

The aggravated white collar crime enhancement has an unambiguous pleading and proof requirement. Subdivision (b)(1) of section 186.11 provides: "The additional prison term and penalties provided for in subdivisions (a), (c), and (d) shall not be imposed unless the facts set forth in subdivision (a) are charged in the accusatory pleading and admitted or found to be true by the trier of fact." Among those "facts set forth in subdivision[] (a)" is that the defendant committed "two or more related felonies, a material element of which is fraud or embezzlement, which involve a pattern of related felony conduct." (§ 186.11, subd. (a)(1).) To establish a "pattern of related felony conduct," the prosecution must plead and prove that the defendant "engag[ed] in at least two felonies that have the same or similar purpose, result, principals, victims, or methods of commission, or are otherwise interrelated by distinguishing characteristics, and that are not isolated events." (§ 186.11, subd. (a)(1).)

13

Here, the information alleged that the two grand thefts (counts one and two) were the two related felonies, and the jury so found. But the trial court imposed the aggravated white collar crime enhancement based on its own finding that the grand theft (count two) was related to the bribery (count four), a relationship that was neither pleaded in the information nor found by the jury. Because the prosecution did not plead and prove that the grand theft and the bribery were related felonies, the trial court erred by imposing the aggravated white collar crime enhancement on defendants Mayle and Rankins-Mayle. (See *People v. Arias* (2010) 182 Cal.App.4th 1009, 1017-1019 [enhancement cannot be imposed when express pleading and proof requirement not met].)

But the Attorney General argues that "[i]t is of no consequence that section 186.11 was not specifically charged with the bribery charge." As support for this proposition, the Attorney General cites *People v. Riva* (2003) 112 Cal.App.4th 981 (*Riva*). That case, however, is distinguishable and does not support the proposition under the circumstances of this case.

In *Riva*, the information alleged an enhancement for discharging a firearm (12022.53, subd. (d)) with respect to two counts charging the defendant with attempted voluntary manslaughter and assault with a firearm, but not with respect to a count of shooting at an occupied vehicle. Despite the absence of an enhancement allegation as to the count of shooting at an occupied vehicle, however, the verdict forms asked the jury to determine the truth of the enhancement on all three counts. The defendant did not object and the jury found the allegation true as to all counts. The trial court imposed the enhancement even on the count for which it was not alleged. (*Riva, supra,* 112 Cal.App.4th at pp. 1000-1001.)

The Court of Appeal affirmed, even though section 12022.53, subdivision (j) requires that for the enhancement to apply it must "be alleged in the accusatory pleading." The court held the statute "only requires the facts necessary to sustain the enhancement be alleged in the information; it does not say where in the information those

14

facts must be alleged or that they must be alleged in connection with a particular count in order to apply to that count.  In [*Riva*] the prosecution complied with the literal language of the statute by alleging the enhancement in the information as to the charges of attempted voluntary manslaughter and assault." (*Riva, supra,* 112 Cal.App.4th at p. 1001, fn. omitted.)

The Court of Appeal concluded that, by pleading the enhancement in other counts, the prosecution put the defendant on notice he was being charged with the enhancement. It also concluded that he was on notice from the enhancement allegation as to the other counts that he had to defend against the allegation.  (*Riva, supra,* 112 Cal.App.4th at pp. 1002-1003.)

The circumstances of this case are different from the circumstances of *Riva*.  Here, the prosecution alleged that the aggravated white collar crime enhancement applied to defendants Mayle and Rankins-Mayle because the two grand theft offenses were "related felonies," as that term is defined in the statute.  They were not put on notice that they had to defend against an allegation that the grand theft and the bribery were "related felonies."  While, factually, the trial court or this appellate court could conclude that the grand theft and the bribery were "related felonies" under the definition of the statute, the same statute requires that the jury make that determination.  It did not do so here, which means we must strike the enhancement as to defendants Mayle and Rankins-Mayle and remand for resentencing.  (*People v. Arias, supra,* 182 Cal.App.4th at p. 1021.)

### 2. *Bailey* and Section 186.11

The Attorney General also asserts that (1) section 186.11 abrogated or modified the *Bailey* doctrine and (2) the trial court was technically correct in applying the aggravated white collar crime enhancement because defendants Mayle and Rankins-Mayle "committed" two separate grand thefts.  Neither assertion has merit.

### i. No Abrogation of the *Bailey* Doctrine

There is no evidence the Legislature expressly or impliedly abrogated the *Bailey* doctrine with the enactment of the white collar crime enhancement.

When the Legislature passes a new law, it is presumed to do so in light of existing cases and statutes. (*People v. Yartz* (2005) 37 Cal.4th 529, 538.) The courts " 'do not presume that the Legislature intends, when it enacts a statute, to overthrow long-established principles of law unless such intention is clearly expressed or necessarily implied.' [Citations.]" (*Brodie v. Workers' Comp. Appeals Bd.* (2007) 40 Cal.4th 1313, 1325.)

The Attorney General cites no legislative declaration that expresses the Legislature's intent to abrogate *Bailey*; instead, she argues that the *Bailey* doctrine and the aggravated white collar crime enhancement are mutually exclusive. She writes: "A comprehensive sentencing and restitution scheme, such as section 186.11, that enhances sentences for the commission of related felonious conduct cannot coexist with a judicially created doctrine that merges those same related offenses. It is not reasonably probable that the Legislature intended for thieves who accumulate large takings by committing separate felony thefts with similar purposes and methods of operation to bypass the greater punishment of section 186.11 because, paradoxically, their offenses shared 'one intention, one general impulse, and one plan.' The '*Bailey* doctrine' cannot survive section 186.11."

While we acknowledge that there is some superficial virtue in the Attorney General's argument, we note that *Whitmer* resolved what seemed to be competing policies in *Bailey* and the aggravated white collar crime enhancement. Having so acknowledged, we disagree that the *Bailey* doctrine and the aggravated white collar crime enhancement were mutually exclusive under the interpretation of *Bailey* found in the Court of Appeal decisions before *Whitmer*. To the contrary, we note the Attorney General's argument that grand theft and bribery can be the two related felonies,

16

supporting imposition of the aggravated white collar crime enhancement. Even though we do not reach this argument because the prosecution did not plead and prove the enhancement as it may have related to the bribery count, we agree that the enhancement applies to crimes other than grand theft. (See *People v. Lai* (2006) 138 Cal.App.4th 1227 [applying aggravated white collar crime enhancement in welfare fraud case].)

Since the *Bailey* doctrine, as we must apply it in this case, and the aggravated white collar crime enhancement are not mutually exclusive, we must presume that that the Legislature did not intend to abrogate *Bailey* and thus allow the trial court to impose the aggravated white collar enhancement based on the two counts of grand theft.

In any event, the trial court did not impose the enhancement based on commission of two counts of grand theft. Instead, it imposed the enhancement based on commission of one count of grand theft and one count of bribery. As we noted, that strategy failed because the prosecutor did not meet the pleading and proof requirement.

### ii. Only One Grand Theft Committed

The Attorney General argues that, even if defendants Mayle and Rankins-Mayle could not be *convicted* of more than one count of grand theft under the *Bailey* doctrine, they were still subject to the aggravated white collar crime enhancement because they *committed* two grand thefts. In support of this argument, the Attorney General quotes section 186.11, subdivision (a)(1), which applies the enhancement to " '[a]ny person who *commits* two or more related felonies. . . .' " (Italics added.)

This distinction is too fine. The *Bailey* doctrine, as applied by the intervening Court of Appeal decisions, prohibited conviction on multiple counts of grand theft under the relevant circumstances because only one crime had been committed. While the scheme involved multiple acts, it supported only one count of grand theft. (*Whitmer, supra,* 59 Cal.4th at p. 742.) Therefore, it cannot be said that defendants Mayle and Rankins-Mayle committed two grand thefts under the *Bailey* doctrine as it existed at the time of their crimes.

17

D.    *Conclusion*

Because the prosecution did not successfully plead and prove that two related felonies were committed as required to impose the aggravated white collar crime enhancement (§ 186.11, subd. (a)(1)), we must order the trial court to strike that enhancement as to defendants Mayle and Rankins-Mayle, as well as the additional term and fine associated with that enhancement.[3]  Given this conclusion, we need not consider the arguments of defendants Mayle and Rankins-Mayle that the evidence was insufficient to support the jury's findings or that the findings violated defendants' constitutional rights.

II

*Grand Theft Counts*

*(Nilsson)*

Unlike the jury that tried defendants Mayle and Rankins-Mayle, the jury that tried defendant Nilsson was not asked whether the two grand theft counts (counts one and two) committed with defendants Mayle and Rankins-Mayle were separate and distinct under the *Bailey* doctrine as interpreted by the Court of Appeal decisions before *Whitmer* was decided.  Defendant Nilsson contends that, despite the absence of a special finding concerning the *Bailey* doctrine, we must strike one of the grand theft convictions because the takings were part of an overarching scheme.  In other words, the facts were insufficient to support both counts.  We agree that the acts did not constitute two grand

---

[3]    As to defendant Nilsson, the jury found that several of his theft crimes were related felonies for the purpose of the aggravated white collar crime enhancement.  Those crimes included the scheme with defendants Mayle and Rankins-Mayle but also included kickback arrangements with other contractors.  Because the Nilsson jury found that several counts other than the two grand theft counts charged in counts one and two were related felonies, the aggravated white collar crime enhancement as applied to defendant Nilsson does not suffer from the same pleading and proof problem as it does applied to defendants Mayle and Rankins-Mayle.

18

thefts under the law as it existed at the time of the acts, which law included the now defunct felony discount.[4]

Defendant Nilsson also contends that his other theft convictions, which covered defendant Nilsson's arrangements with contractors not associated with defendants Mayle and Rankins-Mayle, must be reversed because they were also part of his overarching scheme to take money. To the contrary, the Court of Appeal decisions interpreting *Bailey* do not support the contention.

A.      *Counts One and Two, involving Mayle and Rankins-Mayle*

As noted in our discussion of the grand theft counts as they relate to defendants Mayle and Rankins-Mayle (counts one and two only), the facts of this case fit the "overarching scheme" scenario of the *Bailey* doctrine as defined by the Court of Appeal decisions predating *Whitmer*. While the trial court did not submit to the Nilsson jury the question of whether counts one and two were separate and distinct under the *Bailey* doctrine, we must strike one of those counts because they were part of an overarching scheme, which means that the evidence was insufficient to support both convictions.

The case most similar to this case is *People v. Packard* (1982) 131 Cal.App.3d 622, 626 (*Packard*).[5] In *Packard*, the defendant was convicted of three counts of grand theft. He participated in a scheme over a period of three separate calendar years to fraudulently bill Paramount Studios for reproduction of scripts. Each count covered one of the calendar years. (*Id*. at pp. 625-626.) Applying the *Bailey* doctrine, the Court of

---

[4]      Given this conclusion, we need not determine whether the trial court independently erred by sentencing on both counts of grand theft or whether counsel for defendant Nilsson violated defendant Nilsson's right counsel by not requesting that the jury make a *Bailey*-doctrine finding.

[5]      *Packard* was disapproved by *Whitmer*, at least impliedly. (*Whitmer, supra,* 59 Cal.4th at p. 741.) However, it reflects the law, pre-*Whitmer*, and governs here. (*Id*. at p. 742.)

Appeal concluded that "the only reasonable conclusion supported by the record is that [the defendant] had a single continuing plan or scheme for stealing money from Paramount. [Citation.] [The defendant] should have been convicted of only a single grand theft." (*Id*. at p. 627.)

Here, defendant Nilsson had only a single continuing plan or scheme with defendants Mayle and Rankins-Mayle to steal money from the Library. Thus, he should have been convicted of only a single grand theft as to the scheme with defendants Mayle and Rankins-Mayle.

The Attorney General tries to distinguish *Packard* by asserting that "there were two distinctive plans, not one ongoing scheme." We assume by this she means that the use of a company (All City Maintenance) to bill the Library and then the use of a corporation (Hagginwood) to do the same thing constituted two separate schemes. We disagree. The continuing, overarching scheme of defendants Nilsson, Mayle, and Rankins-Mayle was to overbill the Library for maintenance services and share the ill-gained profits. That the inflated bills were sent to the Library from different business entities did not constitute separate overarching schemes.

The Attorney General also cites cases predating *Bailey*. While those cases may support an argument that the Court of Appeal decisions after *Bailey* misinterpreted *Bailey*, the *Whitmer* court expressly found that the law as interpreted by those post-*Bailey* Court of Appeal decisions is applicable to crimes committed after *Bailey* and before *Whitmer*. (*Whitmer, supra*, 59 Cal.4th at p. 742.) Therefore, an appeal to pre-*Bailey* cases is unpersuasive.

While we agree with the Attorney General that, if *Bailey* had been interpreted properly by the Court of Appeal, defendant Nilsson could have been properly convicted of multiple counts of grand theft for his scheme with defendants Mayle and Rankins-Mayle, we are bound by *Whitmer*'s holding that its proper interpretation of *Bailey* is "an unforeseeable judicial enlargement of criminal liability for multiple grand thefts"

20

(*Whitmer, supra,* 59 Cal.4th at p. 742), and we must apply the law as reflected in *Packard* and other Court of Appeal decisions from that era.

Since the evidence concerning the scheme between defendant Nilsson and defendants Mayle and Rankins-Mayle was insufficient to sustain two counts of grand theft, we must order the trial court to strike one count and remand for resentencing.

B.      *Theft Counts Other Than Counts One and Two*

Defendant Nilsson also contends that his other theft convictions were part of the overarching scheme to take money from the Library and, therefore, there was insufficient evidence to support those convictions separately under the *Bailey* doctrine.  The contention is without merit because those schemes were with other parties, not defendants Mayle and Rankins-Mayle, and the case law before *Whitmer* supports separate convictions in such a case.

Factually, the other counts were not part of the same scheme.  Instead, defendant Nilsson entered into a new arrangement with each of the contractors from whom he received kickbacks.  Although those schemes were similar in that defendant Nilsson gave out work in exchange for kickbacks, they were not the same scheme because he entered into separate arrangements with the various contractors.

The cases that defendant Nilsson relies on are distinguishable.  In *Packard, supra,* 131 Cal.App.3d at page 625, the defendant and his roommate stole money from Paramount Studios by submitting phony invoices.  Here, defendant Nilsson colluded with different people for each of the schemes.  In *People v. Brooks* (1985) 166 Cal.App.3d 24, at page 27, the defendant accepted items for auction from various consignors on one day.  After auctioning off the items on that day, the defendant kept all of the proceeds.  Here, defendant Nilsson acted at various times and with various other actors to illegally obtain funds from the Library.  And, in *People v. Kronemyer* (1987) 189 Cal.App.3d 314, at page 324, an attorney embezzled funds from an elderly client, taking the funds from

21

various sources.  Here, although there was a single victim, the Library, defendant entered into separate plans with separate people to obtain the funds.

This case is more similar to *People v. Woods* (1986) 177 Cal.App.3d 327, at page 331, in which the Court of Appeal distinguished *Bailey*.  In that case, the defendant created 12 different fictitious persons to use for committing welfare fraud.  Although the multiple welfare payments for each fictitious person had to be consolidated into one count, the evidence supported a separate count for each fictitious person because each was a different intention, general impulse, or plan.  (*Id*. at pp. 331-332.)  Here, the agreements with the various contractors constituted separate plans.

As a matter of law, defendant Nilsson's schemes with the various contractors to give out work in exchange for kickbacks were not part of one overarching scheme as defined in the pre-*Whitmer* Court of Appeal decisions.  Accordingly, the evidence was sufficient to support separate convictions for the thefts charged other than in counts one and two.

III

*Unanimity Instruction*

Defendant Mayle was convicted on count six of conflict of interest for making a contract in which he was financially interest.  Government Code section 1090, subdivision (a) provides:  "Members of the Legislature, state, county, district, judicial district, and city officers or employees shall not be financially interested in any contract made by them in their official capacity, or by any body or board of which they are members. . . ."  Even though the trial court gave the jury a unanimity instruction requiring the jury to agree on what act constituted the crime, defendant Mayle contends on appeal that the trial court should have altered the unanimity instruction to require the jury to agree on what "contract" he entered into.  The contention is forfeited because defendant Mayle did not seek a modification of the instruction in the trial court, and, in any event, it is without merit because the unanimity instruction, as given, was sufficient.

The trial court instructed the jury concerning the conflict of interest crime as follows: "Defendant James Mayle is charged in Count Six with acting in his official capacity as a district employee in making or causing to be made a contract in which he had a financial interest in violation of Government Code section 1090." After instructing on the elements of the crime and the meaning of "contract," the trial court added: "The People have presented evidence of more than one act to prove that the defendant committed this offense. You must not find the defendant guilty unless you all agree that the People have proved that the defendant committed at least one of these acts and you all agree on which act he committed."

Defendant Mayle argues that Government Code "[s]ection 1090 concerns 'contracts,' not unspecific acts of the defendant, and thus the general unanimity instruction was woefully insufficient to inform the jury that to return a verdict of guilty on count 6 they must unanimously agree on the contract forming the basis for criminal liability."

We conclude that the unanimity instruction, as given, was not reasonably likely to be understood by the jury to allow them to convict on count six even if they did not agree on what contract was the basis for the conviction. "What differentiates [Government Code] section 1090 from other conflict of interest statutes such as the Political Reform Act of 1974 (Political Reform Act) (§ 87100 et seq.) is its focus on the making of a contract in which one has an impermissible interest. [Citation.]" (*Lexin v. Superior Court* (2010) 47 Cal.4th 1050, 1074, italics & fn. omitted.) The prohibited act, therefore, is making a contract. And the jury was correctly instructed both that the prohibited act was making a contract and that it must agree unanimously on what act defendant committed to violate Government Code section 1090. The contention that something more than the standard unanimity instruction was required under these circumstances is simply unpersuasive.

23

Having concluded that the contention is without merit – that is, that the asserted error did not affect his substantial rights – we also conclude that failing to seek a modification of the instruction forfeited the argument. "Because the court's unanimity instruction regarding the counts listed was not reasonably likely to be understood as [defendant Mayle] asserts, his substantial rights were not affected and therefore a timely objection and/or request for modification or clarification was required to preserve the claim of error for purposes of appeal. [Citations.]" (*People v. Milosavljevic* (2010) 183 Cal.App.4th 640, 648-649 (*Milosavljevic*), fn. omitted.)

Finally, because the contention that the instruction was deficient and caused prejudice to defendant Mayle is without merit, we need not consider whether trial counsel for defendant Mayle violated his right to counsel by failing to seek modification of the instruction. (See *Strickland v. Washington* (1984) 466 U.S. 668, 688, 691-692 [80 L.Ed.2d 674, 694, 696] (*Strickland*).)

IV

*Aider and Abettor Instruction*

Defendant Mayle contends that the trial court's use of a former version of CALCRIM No. 400 to instruct the jury that a defendant is "equally guilty" whether that defendant is the direct perpetrator or an aider and abettor was error and requires reversal of his convictions on count two (grand theft) and count four (bribing a public employee). He also contends that, if he forfeited this contention by failing to seek modification of the instruction in the trial court, his trial counsel violated his right to counsel by not seeking the modification. We conclude defendant Mayle forfeited the contention and that counsel did not violate his right to counsel because there was no prejudice.

The trial court instructed the jury with former CALCRIM No. 400, which stated: "A person may be guilty of a crime in two ways. One, he or she may have directly committed the crime. I will call that person the perpetrator. Two, he or she may have aided and abetted a perpetrator who directly committed the crime. A person is equally

24

guilty of the crime whether he or she committed it personally or aided and abetted the perpetrator who committed it." An April 2010 revision eliminated the word "equally," so the instruction now reads, "A person is guilty of a crime whether he or she committed it personally or aided and abetted the perpetrator." (CALCRIM No. 400 (2011) p. 167.) However, in instructing the jury in this case, the trial court used the older language.

"Generally, a person who is found to have aided another person to commit a crime *is* 'equally guilty' of that crime. (§ 31; see 1 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Introduction to Crimes, § 77, pp. 122-123.)

"However, in certain cases, an aider may be found guilty of a greater or lesser crime than the perpetrator. (*People v. McCoy* (2001) 25 Cal.4th 1111, 1114-1122 [an aider might be found guilty of first degree murder, even if shooter is found guilty of manslaughter on unreasonable self-defense theory]; *People v. Woods* (1992) 8 Cal.App.4th 1570, 1577-1578 [aider might be guilty of lesser crime than perpetrator, where ultimate crime was not reasonably foreseeable consequence of act aided, but a lesser crime committed by perpetrator during the ultimate crime was a reasonably foreseeable consequence of the act aided].)" (*People v. Lopez* (2011) 198 Cal.App.4th 1106, 1118 (*Lopez*), original italics, disapproved on other grounds in *People v. Banks* (2015) 61 Cal.4th 788, 809, fn. 8.)

Defendant claims the older version of the instruction misstates the law. He is mistaken. Former CALCRIM No. 400, including the " 'equally guilty' " language is " 'generally correct in all but the most exceptional circumstances . . . .' " (*People v. Nero, supra,* 181 Cal.App.4th at pp. 518-519, quoting *People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1164-1165.)

A.      *Forfeiture*

As we held in *Lopez, supra,* 198 Cal.App.4th at pages 1118 and 1119, defendant Mayle forfeited this contention because he did not raise it in the trial court and ask for a modification of the instruction, which generally states the law correctly.

"Because the instruction as given was generally accurate, but potentially incomplete in certain cases, it was incumbent on [defendant Mayle] to request a modification if [he] thought it was misleading on the facts of this case. [His] failure to do so forfeits the claim of error. (*People v. Lang* (1989) 49 Cal.3d 991, 1024 [party may not claim 'an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language']; see *People v. Samaniego*[, *supra*,] 172 Cal.App.4th [at pp.] 1163-1165 [] [challenge to [former] CALCRIM No. 400 forfeited for failure to seek modification]; but see *People v. Nero*[, *supra*,] 181 Cal.App.4th [at pp.] 517-518 [] [construing [former] CALJIC No. 3.00, also using the 'equally guilty' language, and finding it misleading 'even in unexceptional circumstances'].)" (*Lopez, supra*, 198 Cal.App.4th at pp. 1118-1119, fn. omitted.)

Defendant Mayle therefore forfeited the contention that former CALCRIM No. 400, as given to the jury in this case, did not adequately guide the jury.

B.      *Effective Assistance of Counsel*

Defendant Mayle contends that his trial counsel violated his right to counsel by not seeking modification of former CALCRIM No. 400. We disagree because modification of the instruction would not have yielded a jury verdict more favorable to him.

To establish ineffective assistance of counsel, a defendant must show (1) counsel's performance was below an objective standard of reasonableness under prevailing professional norms, and (2) the deficient performance prejudiced defendant. (*Strickland, supra,* 466 U.S. at pp. 688, 691-692; *People v. Ledesma* (1987) 43 Cal.3d 171, 216-217 (*Ledesma*).) To show prejudice, a defendant must show a reasonable probability that he would have received a more favorable result had counsel's performance not been deficient. (*Strickland, supra,* at pp. 693-694; *Ledesma, supra,* at pp. 217-218.) "A

26

reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland, supra,* at p. 694.)

There is no need to address the issue of whether counsel's performance was deficient when we can dispose of an ineffective assistance of counsel claim on the ground of lack of prejudice. (*In re Fields* (1990) 51 Cal.3d 1063, 1079.) Here, we need not determine whether counsel's performance was deficient for not seeking a modification of former CALCRIM No. 400 because it is not reasonably probable that a modification of the instruction would have resulted in a verdict more favorable to defendant Mayle.

The trial court instructed the jury fully and properly on the elements of the crimes charged against defendant Mayle in count two (grand theft) and count four (bribing a public employee). Therefore, the jury would have understood the "equally guilty" language in this context, which required that the jury find all elements of the crimes, including intent, before finding defendant Mayle guilty. (*Lopez, supra*, 198 Cal.App.4th at pp. 1119-1120.)

Immediately after giving the instruction which included the "equally guilty" language, the trial court instructed the jury on the required proof for aiding and abetting. That instruction included the following language: "Someone aids and abets a crime if he or she knows of the perpetrator's unlawful purpose and he or she specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator in the commission of the crime." Therefore, defendant Mayle's assertion that the jury may have relied on the "equally guilty" language to convict him based on conduct that was not culpable is without merit because the jury was instructed specifically on the required proof for aiding and abetting.

Defendant Mayle fails to establish any specific way in which the jury would have misunderstood and misapplied former CALCRIM No. 400 under the circumstances of this case to convict him without finding all elements of the crimes. He claims that the "error was prejudicial because the evidence against [defendants] Rankins[-Mayle] and

27

Nilsson was relatively strong compared to the very weak evidence presented against [him] . . . ." Even if we accept as true, without agreeing with, this claim that the evidence was stronger with respect to the other defendants, there still is no indication in the record that former CALCRIM No. 400 caused the jury to convict without finding all elements of the crimes.

Defendant Mayle also asserts that prejudice from former CALCRIM No. 400 is manifested in the jury's request to have testimony critical to the issue of his intent read back to them. To the contrary, this fact shows that the jury was appropriately focused on whether defendant Mayle had the requisite intent.

Therefore, we conclude that defendant Mayle's contention of ineffective assistance of counsel is without merit because he cannot establish prejudice.[6] It is not reasonably probable he would have received a more favorable verdict had his trial counsel asked the court to modify former CALCRIM No. 400.

V

*Bribery Instructions*

Defendants Mayle and Rankins-Mayle contended in their opening briefs that the jury instructions concerning bribery (count four) were prejudicially flawed because those instructions allowed the jury to convict based on invalid theories of criminal liability. After defendants Mayle and Rankins-Mayle filed their opening briefs, the California Supreme Court filed its opinion in *People v. Biane* (2013) 58 Cal.4th 381 (*Biane*), which clarified the law concerning permissible theories underlying bribery convictions. In his reply brief, defendant Mayle acknowledged that *Biane* foreclosed his argument. Consequently, he withdrew the argument. Defendant Rankins-Mayle, on the other hand,

---

[6] For the same reasons, we conclude that defendant Mayle's substantial rights were not affected by the instruction. (See *Milosavljevic, supra,* 183 Cal.App.4th at pp. 648-649.)

28

did not withdraw the argument, so we must consider it. After consideration, we find it is without merit.

Offering a bribe and receiving a bribe are two different crimes. Section 67.5 proscribes offering a bribe to a public officer or employee.[7] And section 86 proscribes accepting a bribe by a public officer or employee.[8]

Here, the trial court instructed the jury concerning alternative theories to find defendants Mayle and Rankins-Mayle guilty of bribery in violation of section 67.5. In addition to an instruction detailing the elements of bribery (CALCRIM No. 2601), the court gave the jury standard instructions on aiding and abetting (CALCRIM Nos. 400, 401) and conspiracy (CALCRIM No. 416). In the conspiracy instructions, the trial court identified defendant Nilsson as one of the potential coconspirators who committed overt acts. Finally, in closing argument, the prosecutor argued that the acts of each of the three

---

[7]     Penal Code section 67.5 provides:

"(a)  Every person who gives or offers as a bribe to any ministerial officer, employee, or appointee of the State of California, county or city therein, or political subdivision thereof, any thing the theft of which would be petty theft is guilty of a misdemeanor.

"(b)  If the theft of the thing given or offered would be grand theft the offense is a felony punishable by imprisonment pursuant to subdivision (h) of Section 1170."

[8]     Penal Code section 86 provides, in pertinent part:  "Every Member of either house of the Legislature, or any member of the legislative body of a city, county, city and county, school district, or other special district, who asks, receives, or agrees to receive, any bribe, upon any understanding that his or her official vote, opinion, judgment, or action shall be influenced thereby, or shall give, in any particular manner, or upon any particular side of any question or matter upon which he or she may be required to act in his or her official capacity, or gives, or offers or promises to give, any official vote in consideration that another Member of the Legislature, or another member of the legislative body of a city, county, city and county, school district, or other special district shall give this vote either upon the same or another question, is" guilty of a felony.

29

defendants were attributable to the others based on theories of aiding and abetting and conspiracy.

Defendant Rankins-Mayle argues that she could not be found guilty of bribery based on aiding and abetting defendant Nilsson or conspiring with him because, under the facts of this case, defendant Nilsson did not commit bribery (instead, he received the bribe). She relies mainly on *People v. Wolden* (1967) 255 Cal.App.2d 798 (*Wolden*).

But the California Supreme Court held that *Wolden* does not stand for that proposition. It is a misreading of *Wolden*. (*Biane, supra,* 58 Cal.4th at p. 396.) Instead, the Supreme Court held: "Although neither the offer nor payment of a bribe in itself can establish that the offeror aided and abetted the separate crime of receiving the same bribe, the status of being the offeror or payor of a bribe does not disqualify that person, as a matter of law, from complicity in the offense of receiving the bribe. Whether the offeror is guilty of aiding and abetting the receipt of the bribe depends on whether there is evidence that, in addition to the offer or payment of the bribe, the offeror ' "with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime." ' [Citation.] Similarly, being the offeror or payor of a bribe does not disqualify that person, as a matter of law, from culpability for participating in a conspiracy to accept that same bribe." (*Id.* at pp. 384-385.)

Therefore, the trial court's instructions, which generally explained aiding and abetting and conspiracy and identified defendant Nilsson as a potential coconspirator, were not erroneous, as explained by *Biane*. Furthermore, the prosecutor's closing argument did not mislead the jury. While the prosecutor argued generally that the defendants could be found liable on aiding and abetting and conspiracy theories based on the acts of the other defendants, the prosecutor did not specify any legally erroneous theory of aiding and abetting or conspiracy.

30

Defendant Rankins-Mayle attempts to distinguish *Biane*. She argues: "The California Supreme Court did not hold that a defendant may be properly convicted of giving or offering a bribe based on a finding the defendant aided and abetted another in the offense of receiving a bribe, or on a finding that the defendant conspired with the person receiving the bribe to commit the offense of giving or offering a bribe. The defendants in *Biane* were charged with offenses that included conspiracy to accept bribes, and adding and abetting the acceptance of bribes. [Citation.] The court held that 'whether the offeror of a bribe may be charged with aiding and abetting another in the crime of receiving the bribe depends on whether the offeror's conduct, beyond merely offering or paying a bribe, satisfies the elements of aiding and abetting the receipt of the bribe.' [Citation.]"

While we agree with defendant Rankins-Mayle that the circumstances of this case are different from the circumstances in *Biane* on the theory of aiding and abetting, we disagree that the difference is significant in this case. While the question in *Biane* was whether the offeror could aid and abet the recipient in *receiving a bribe*, the question that defendant Rankins-Mayle presents here is whether the offeror could aid and abet the recipient in *offering a bribe*. Even if this theory posited by defendant Rankins-Mayle is invalid (that is, that the offeror cannot aid and abet the receiver in *offering a bribe*), the trial court did not specifically present that theory to the jury. The court did not tell the jury it could find defendant Rankins-Mayle guilty of bribery on a theory of aiding and abetting defendant Nilsson in committing bribery. Nor did the prosecutor argue to the jury that defendant Rankins-Mayle's guilt on the bribery count was based on aiding and abetting defendant Nilsson. The instructions on aiding and abetting were generally correct. If defendant Rankins-Mayle desired more specificity, it was incumbent on her to request clarification. The failure to do so is a forfeiture of the issue. (*Milosavljevic, supra*, 183 Cal.App.4th at pp. 648-649.) Furthermore, under the facts of this case, there

is no indication the jury relied on an aiding and abetting theory to find defendant Rankins-Mayle guilty of bribery. She wrote the checks.

On the theory of conspiracy, we see no difference between *Biane* and this case. Under *Biane*, defendant Rankins-Mayle could have conspired with defendant Nilsson to offer a bribe, even though defendant Nilsson was the one receiving the bribe. In essence, the overall conspiracy was to give and receive bribes. The actions of all defendants contributed to that conspiracy. Therefore, instructing on conspiracy, even with defendant Nilsson as a coconspirator, was proper.[9]

## VI

### *Conspiracy Instruction*

Defendant Rankins-Mayle contends that the trial court erred by instructing the jury that it could find her guilty of the charged offenses if she participated in an uncharged conspiracy to commit the offenses. She claims that participation in an uncharged conspiracy is not a valid theory of derivative criminal liability. In her reply brief, she concedes that the California Supreme Court has rejected this argument, finding that an uncharged conspiracy can be the basis of derivative liability. (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1200-1201.) Nonetheless, she continues to assert that the California Supreme Court is wrong. As made in this court, her assertion is without merit because we are bound by the decisions of the California Supreme Court. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

---

[9]     Defendant Mayle also contends that the cumulative effect of the asserted errors concerning aiding and abetting and bribery resulted in prejudice to him. Because there was no error in the bribery instructions and no prejudice as to the aiding and abetting instructions, there is no cumulative prejudice to consider.

## VII

### *Enhancements for Amount of Losses*

Defendant Rankins-Mayle contends we must reverse the enhancements for the amount of losses incurred by the Library as a result of her crimes, for which the trial court sentenced her to an additional two years under former section 12022.6. She claims the prosecution failed to prove that the losses exceeded the threshold amounts of $50,000 and $150,000. To the contrary, the prosecution established the Library's losses of more than $780,000.

At the time of the crimes, former section 12022.6, subdivision (a) provided for enhancements when the crime caused losses exceeding set amounts, as follows: "When any person takes, damages, or destroys any property in the commission or attempted commission of a felony, with the intent to cause that taking, damage, or destruction, the court shall impose an additional term as follows: [¶] (1) If the loss exceeds fifty thousand dollars ($50,000), the court, in addition and consecutive to the punishment prescribed for the felony or attempted felony of which the defendant has been convicted, shall impose an additional term of one year. [¶] (2) If the loss exceeds one hundred fifty thousand dollars ($150,000), the court, in addition and consecutive to the punishment prescribed for the felony or attempted felony of which the defendant has been convicted, shall impose an additional term of two years." (Former § 12022.6, subd. (a)(1)&(2); Stats. 1998, ch. 454, § 2, p. 3231.)

The jury found true the allegations that defendant Rankins-Mayle's crimes caused a loss of more than $50,000 and also of more than $150,000. The trial court imposed a two-year term under former section 12022.6, subdivision (a)(2), and stayed the term under former section 12022.6, subdivision (a)(1), under section 654.

The accounting undertaken by the Department of Justice revealed that the Library paid a total of $1,343,891.68 to All City Maintenance and Hagginwood. Of that amount,

All City Maintenance and Hagginwood paid $562,500.89 to contractors. That meant that All City Maintenance and Hagginwood kept $781,390.79. We conclude that this last number ($781,390.79) is the amount of the loss to the Library because (1) there was no agreement allowing defendants to increase the amount charged by the contractors when billing the Library and (2) what the contractors charged is the fair market value of the services.

It is undisputed that the Library received maintenance services, even if what was charged for those services was exorbitantly high. Therefore, the difference between what the Library paid and what the services were actually worth represents the Library's loss.

The general principles applicable to calculating the amount of the loss attributable to defendants' crimes were discussed in *People v. Crow* (1993) 6 Cal.4th 952, at pages 961-962: "[I]n determining whether to impose the one-year sentence enhancement of Penal Code [former] section 12022.6, subdivision (a), the defrauded agency's 'loss' should be calculated by subtracting the amount the government would have paid had no acts of fraud occurred from the amount the government actually paid. Any money that the government would have been obligated to pay had the fraud not occurred is not attributable to the fraud, and thus is not a 'loss' arising out of the criminal offense."

Here, the jury could have reasonably inferred that, if defendants had not entered into their plan of public corruption, bribery, and theft, the Library would have paid the same amount to the contractors as was paid by All City Maintenance and Hagginwood. The bargaining position of those companies was no greater than the bargaining position of the Library itself. Therefore, the jury could have concluded that the loss to the Library from defendants' crimes was the amount kept by defendants – that is, $781,390.79, which is well over the threshold amounts for the former section 12022.6, subdivision (a) enhancements.

Even if we were to assume that All City Maintenance and Hagginwood conducted a legitimate business and we were to allow for a reasonable profit, there was expert

34

testimony by an investigative auditor that most businesses have a profit of seven to 10 percent. Here, that would have amounted to a profit of no more than $57,000, which is about 10 percent of what was paid to the contractors. Adding the amount paid to the contractors ($562,500.89), plus a reasonable 10 percent profit ($57,000), the Library should have paid less than $620,000 for the services. Instead, the Library paid more than $1.3 million, and defendants took in more than $780,000 after paying the contractors. Therefore, even assuming a reasonable profit (which is a stretch because the business arrangement between defendants and the Library was based on public corruption from the beginning), defendants' crimes cost the Library more than $680,000.

Defendant Rankins-Mayle remonstrates that the prosecution did not establish the fair market value of the services the Library received. To the contrary, the fair market value can be established by the contract price. (§ 484.) Here, the amount paid to the contractors was the contract price, or the fair market value, of the services rendered.

As noted, the jury could reasonably infer that the Library would have paid what was paid to the contractors. Accordingly, the evidence was sufficient to sustain the enhancements.

## VIII

### *Evidence Supporting Aggravated White Collar Crime Enhancement*

### *(Nilsson)*

Defendant Nilsson contends that the evidence was insufficient to sustain a finding under section 186.11, subdivision (a)(2), that the loss to the Library was more than $500,000 because there was no evidence that he received that much money. This contention is without merit because the premise – that the amount personally received by the defendant must exceed $500,000 – is false.

Defendant Nilsson argues, without authoritative support, that the Legislature meant to limit application of the enhancement to defendants who personally receive more

than $500,000 in ill-gotten gains.  The language of the enhancement statute does not support that view.

Section 186.11, subdivision (a)(2) provides:  "If the pattern of related felony conduct involves the taking of, or *results in the loss by another person or entity* of, more than five hundred thousand dollars ($500,000), the additional term of punishment shall be two, three, or five years in the state prison."  (Italics added.)

The italicized part of the statute, above, clearly refers to the amount of loss to the entity, not the amount personally received by the defendant.  Therefore, defendant Nilsson's contention that the evidence was insufficient to support the enhancement finding is without merit because his proposed interpretation of the statute is unreasonable.

IX

*Correction of Abstract of Judgment*

The trial court ordered defendant Nilsson alone to pay $33,675 in restitution for the counts in which defendants Mayle and Rankins-Mayle were not involved.  It also ordered defendant Nilsson to pay $781,390 jointly and severally with defendants Mayle and Rankins-Mayle, for the counts involving all three defendants.  The abstract of judgment prepared for defendant Nilsson in this case, however, did not make this distinction in the restitution ordered; instead, it lumped it all together as $815,065 in restitution.  On appeal, defendant Nilsson argues that the abstract of judgment must clearly indicate what restitution is his sole responsibility and what restitution he owes jointly and severally with defendants Mayle and Rankins-Mayle.  The Attorney General agrees, as do we.  On remand, the trial court must indicate in the abstract of judgment what restitution defendant Nilsson alone owes and what restitution is subject to joint and several liability.  (*People v. Neely* (2009) 176 Cal.App.4th 787, 800.)

DISPOSITION

As to defendants Mayle and Rankins-Mayle, the trial court is directed to strike the true findings on the enhancement allegations under section 186.11.  As to defendant

36

Nilsson, the trial court is directed to strike the conviction on count one and modify the conviction on count two to cover the time period formerly covered by counts one and two together.  Except for the conviction and true findings that we direct the trial court to strike, the convictions and true findings are affirmed.  The sentences of all three defendants are reversed, and the case is remanded for resentencing (see *People v. Navarro* (2007) 40 Cal.4th 668, 681 ["a remand for a full resentencing as to all counts is appropriate, so the trial court can exercise its sentencing discretion in light of the changed circumstances"]) and preparation of amended abstracts of judgment in which the new sentences (including terms, fines, fees, and restitution) and whether restitution is subject to joint and severable liability are properly reflected.


       NICHOLSON     , Acting P. J.



We concur:



     MAURO        , J.



     HOCH         , J.

37